Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 2539 | **DATE** | June 20, 2001 |
| **CASE TITLE** | USA ex rel., Johnnie Walton v. Jerry D. Gilmore | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] The petition of Johnnie Walton for a writ of *habeas corpus* [ ] is denied   ENTER MEMORANDUM OPINION.

(11) ☒ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | JUN 25 2001 | |
| | Notified counsel by telephone. | | date docketed | 109 |
| | Docketing to mail notices. | ED-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Mail AO 450 form. | 01 JUN 23 PM 3:18 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| KAM | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

(Reserved for use by the Court)

97-2539-011                                              June 20, 2001

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES of AMERICA )
ex rel. JOHNNIE WALTON, )
                         )
        Petitioner,      )
                         )
    vs.                  )   No. 97 C 2539
                         )
JERRY GILMORE,           )
                         )
        Respondent.      )

DOCKETED
JUN 25 2001

## MEMORANDUM OPINION

In our opinion of September 7, 2000, we concluded that petitioner Johnnie Walton was entitled to an evidentiary hearing on three issues: (1) the hours of the day on which the first two sessions of his trial took place; (2) the materiality of the photographs petitioner claims were withheld and destroyed by the prosecution; and (3) whether Walton's right to effective assistance of counsel was denied by counsel's failure to call Minnette Buckley as a witness.

The evidentiary hearing took place on November 20, 2000. The parties have filed post-hearing briefs, and we are now ready to make a final ruling on Mr. Walton's petition for a writ of *habeas corpus*.

### I. THE HOURS AT WHICH THE TRIAL TOOK PLACE

We are satisfied from the evidence presented at the evidentiary hearing that the first two sessions of the trial did

109

take place, as Walton alleges, during the late evening hours of September 19 and 21, 1989, and that the sessions may have lasted until after 10:30 p.m. The reason for the late sessions was Judge Reyna's diligent approach to his work. As he stated in his deposition, he sometimes worked that late in order to get the work done.

Respondent argues that the evidence is inconclusive, at least as to the first night's session, conceding, however, that as to the second night, " . . .trial could have ended as late as 11:10 p.m. on September 21, 1989." We are persuaded by the testimony of Judge Reyna and the other witnesses who testified at the evidentiary hearing that the trial ran late at night on both September 19 and September 21.

The hours of the trial are important because of their relationship to the petitioner's constitutional claims. We will discuss the significance of our finding as it relates to each of the claims.

At one point, petitioner was contending that the lateness of the hour might have caused fatigue on the part of his counsel and the trial judge, thus raising due process and Sixth Amendment questions. No evidence has been presented that supports any such contention. While not many judges work in court as late as Judge Reyna does, many work late at night in chambers or at home with no difficulty. The same is true of attorneys. There is no evidence, and nothing in the transcript of the trial, to indicate that Judge

Reyna was experiencing any fatigue. The same is true of petitioner's two public defenders. It would be nothing but speculation to say that their performance was impaired by the lateness of the hour.

Another question is whether the lateness of the hour prevented Walton from calling witnesses in his defense. As we indicated in our Memorandum Opinion of September 7, 2000 at 15-16, only the state presented witnesses at the first two sessions. The defense presented its evidence at the third session, which took place in the daytime. Therefore, the lateness of the hour of the first two sessions did not prevent Walton from calling witnesses.

What the lateness of the hour did do, however, was to foreclose the attendance of the public at the first two sessions. The courthouse was closed, the doors were locked. Minnette Buckley tried to attend, but was turned away. Walton has proved his claim that the first two sessions, encompassing the entirety of the prosecution's evidence, were closed to the public. While he has not shown specific prejudice, it is not necessary that he do so. See Waller v. Georgia, 467 U.S. 39, 49-50 (1984). A violation of a defendant's right to a public trial "necessarily implied prejudice and more than that need not appear. Furthermore, it would be difficult, if not impossible, in such cases for a defendant to point to any definite, personal injury. To require him to do so would impair or destroy the safeguard." United States v. Kobli, 172 F.2d 919, 921 (1949) (citing cases). There can be

exceptional circumstances warranting exclusion of the public, but a judge's desire to work late is certainly not one of them.

The more difficult question in this case is whether petitioner has a right to the relief he seeks, a new trial. In his post-hearing brief at 5-7, Walton cites a number of cases in which exclusion of members of the public has been held to require a new trial. But in each of these cases in which that relief was granted, the defendant objected at the time the trial judge entered the order excluding the public. Walton's counsel made no objection to the late hours of the trial, did not point out to Judge Reyna that the effect was to exclude the public, and did not request that the trial be held during daytime hours. Of course, Judge Reyna might have overruled the objection had one been made. On the other hand, he might have sustained it. But because the objection was not made, there is no way of knowing how he would have ruled. Petitioner has emphasized that specific prejudice need not be shown, and he is right about that. But a different question is whether, by not objecting, petitioner waived his right to a public trial. The right is susceptible to waiver, but the few cases that have dealt with the question have mostly involved an express waiver, rather than a waiver by failure to object. See, e.g., United States v. Sorrentino, 175 F.2d 721, 723 (3rd Cir. 1949). Here, the subject of excluding the public was never mentioned during the trial. It is something that happened as a consequence of the doors to the courthouse being closed. Indeed, it seems

likely that none of the participants in the trial gave any thought to the matter of whether members of the public were in attendance or not. In this kind of situation, where the exclusion of the public is an unintended consequence of a judge's action, rather than something he intends to bring about, it seems especially appropriate to require an objection in order to preserve the point for appeal.[1] The closest case we have found is People v. Lawrence, 268 Ill. App.3d 327, 644 N.E.2d 19 (1st Dist. 1994), where the state trial judge had accidentally turned the courtroom microphone off, preventing persons seated in the gallery from hearing a portion of the state's rebuttal argument. The court informed the parties as to what had happened, and no objection was made. On appeal, the Illinois Appellate Court held that by failing to object, the defendant had waived any argument that he had been denied a public trial. The Court noted that:

> [D]efense counsel never objected to the incident. Nor did defense counsel seek to have the situation remedied

---

[1] On the question of the inadvertent closure, the case of United States v. Al-Smadi, 15 F.3d 153 (10th Cir. 1994) is of interest. In that case, the courthouse doors were closed at 4:30 p.m. and defendant's trial continued until 4:50 p.m. During the 20-minute closure, the defendant's wife and child were unable to gain entry to the courthouse. The Tenth Circuit emphasized the fact that the trial judge had not intended to exclude anyone from the courtroom, and held that there had been no violation of the defendant's right to a public trial:

> The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom. The brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment.

Id. at 154-55 (citations omitted). Apparently there had been no objection, but the court did not discuss waiver. On the question of whether an intentional act of the trial judge is required, we hesitate to rely on Al-Smadi because the denial of access was so brief.

       by asking that the portion of argument be repeated for the benefit of the spectators. Based upon these circumstances, we conclude that the error was waived by defendant.

Id., 644 N.E.2d at 21. When the defendant Lawrence had exhausted his state court appeals, he filed a *habeas* petition in this court. His public trial argument met the same reception it had received in the Illinois Appellate Court. Judge Coar held that Lawrence had procedurally defaulted any violation of his public trial right by failing to object.[2/]

The final question in regard to the closing is whether Walton's two public defenders were constitutionally deficient in failing to object to the late hours of the trial. We think not. This is not one of those situations where counsel was aware of specific prejudice — the barring of a defense witness from entering the courthouse, or the barring of sympathetic members of the public, or the press, from a high profile case, for example. Walton's trial was a routine drug case in which the press had no interest and the presence of spectators would have been of no practical benefit to the defendant.[3/] If an objection been made and sustained, the trial would have been moved to daytime hours. Had

---

[2/]    United States ex rel. Lawrence v. Nelson, No. 97 C 2678, WL 608770 1999 (N.D. Ill. Ang. 6, 1999). Judge Coar also held that in the circumstances Lawrence's right to a public trial had not been violated. See id.

[3/]    This is not to denigrate the importance of the right to a public trial, or the theory of implied prejudice explained in the cases. We think, however, it is appropriate to evaluate the adequacy of counsel's performance in terms of what appeared to be the practical needs of the case at the time.

this occurred and spectators attended a daytime trial, there is no reason to believe it would have assisted Walton's defense. If counsel had made the objection and been overruled, Walton would have preserved for appeal the violation of his right to a public trial. This might have resulted in a remand for a new trial, to be conducted during daytime hours. It is possible that the result of that trial would have been different than the result of the first one, but it could also have been the same. In any event, it is difficult to see how a different result would be related to whether the courthouse was open or closed. In short, we fail to see how objecting to the lateness of the hour and the consequent lack of public access to the courtroom was a strategy that would have been obvious to most competent trial lawyers. On the contrary, we think that <u>not</u> making the objection fell "within the wide range of reasonable professional assistance." <u>Strickland v. Washington</u>, 466 U.S. 668, 689 (1984).[4]

We conclude that petitioner is not entitled to relief based upon the lateness of the hours during which the first two sessions of his trial were conducted.

## II. THE PHOTOGRAPHS

Part of our focus at the evidentiary hearing was the matter of

---

[4] In <u>United States ex rel. Lawrence v. Nelson</u>, cited <u>supra</u> n. 4, Judge Coar held that a new trial was not warranted even if there had been a violation of Lawrence's right to a public trial. The purpose of a new trial would be to repeat in public the portion of the proceedings from which the public had been excluded, and, "[a]s Petitioner's case was a bench trial, this repetition would not result in any material change in the outcome of the case. Consequently, . . . Petitioner is not entitled to a new trial." <u>Id.</u> at *4.

photographs Walton claims were withheld by the state in violation of Brady v. Maryland, 373 U.S. 83 (1963) and allegedly later destroyed in violation of Arizona v. Youngblood, 488 U.S. 51 (1988). There were photographs offered by the state at the trial, but Walton claims there were different photographs taken during the events immediately preceding his arrest that were not produced at the trial. He claims that these photographs tended to support his entrapment defense in that they showed him to be wearing a beeper and also showed the presence of Mark Hill and Mario Pass at the scene.

Walton testified at the evidentiary hearing that he saw these now missing "arrest" photos when they were shown to him six months prior to his criminal trial in connection with the state's petition to forfeit his motorcycle. He says that he viewed the photographs during a conference in chambers before the forfeiture hearing in open court began. We find this testimony implausible.[5/] Walton was in custody, and this was a minor, routine case. The idea that a judge would have a conference in chambers with a handcuffed defendant prior to a routine civil forfeiture hearing, and discuss an array of photographs, is outside our realm of experience.

We believe that there may in fact have been two sets of

---

[5/] The in-chambers photo exhibition is Walton's explanation for the fact that the transcript of the in-court forfeiture hearing, in which officer Pappalito describes a series of photographs, contains no reference to Hill or Pass or to any beeper being worn by Walton. Walton testified at the evidentiary hearing in this case that the photos displayed at the in-court forfeiture hearing were different from the ones he had just seen in the judge's chambers.

photographs, one used at the trial (and produced again at the evidentiary hearing conducted here) and another set displayed by officer Pappalito during his testimony at the forfeiture hearing. But we do not believe Walton's testimony that the forfeiture photos showed the presence of Mark Hill and Mario Pass at the scene of the May 18, 1987 drug transaction for which Walton was later tried by Judge Reyna. Instead, we think it more likely that Walton was correct when he protested repeatedly at the forfeiture hearing that the photographs officer Pappalito was testifying about showed a different scene and related to a different drug transaction. Pappalito insisted that the photographs were of the Butaro Foods parking lot where the May 18 transaction occurred, whereas Walton was sure they showed the Walgreens parking lot. See Transcript of Forfeiture Hearing at 10-11.

Walton had four drug transactions with Pappalito, each at a different parking lot. What may have happened is that Pappalito mistakenly brought the wrong photos to the forfeiture hearing. The drug transactions had taken place two years earlier, and he could have been confused. Perhaps no photos were taken during the May 18 transaction, but if any were taken they were not the one displayed at the forfeiture hearing. Then, when the trial took place in September of 1989, the forfeiture photos were not used, perhaps because by that time Pappalito realized that they did not pertain to the May 18, 1987 incident.

In any event, Walton has not shown that exculpatory

photographs were withheld or destroyed by the state. The only evidence that there were photos showing Hill and Pass is Walton's improbable testimony about seeing them in the judge's chambers. Even if such photos had existed, they would not have been likely to have changed the result of the trial. Walton admitted that he delivered drugs to Pappalito on May 18. Whether Hill and Pass were at the scene or not, or whether Walton was wearing a beeper, it would not have established entrapment. Walton delivered drugs to Pappalito on three other occasions besides May 18. The Illinois Appellate Court found that neither the allegedly missing forfeiture photographs nor the testimony of Mark Hill would have been likely to affect the result:

> Defendant next claims that trial counsel failed to introduce pictures showing defendant wearing a beeper at the time of his arrest, which would have impeached the testimony of Pappalito that defendant did not have a beeper when he was arrested. However any impeachment of the officer's testimony on this collateral issue would have little impact on the outcome of the case where defendant corroborated the critical testimony of Pappalito. Defendant acknowledged that he was introduced to Pappalito by Mark, that he delivered PCP to Pappalito on four occasions, including the day of arrest and that he received money and additional PCP as part of these transactions.

> Defendant's final allegation is that Mark should have been called as a witness to bolster defendant's entrapment defense. However, defendant testified that on several occasions he sold PCP to Pappalito in exchange for money at prearranged times and locations which were negotiated by Pappalito and defendant outside the presence of Mark. Thus, counsel's failure to call Mark as a witness did not result in any prejudice to defendant.

People v. Walton, 240 Ill. App.3d 49, 608 N.E.2d 59, 62-63 (1st Dist. 1992). We agree with this analysis.

### III. FAILURE TO CALL MINNETTE BUCKLEY

One of the matters we thought required an evidentiary hearing was the failure of defense counsel to interview Minnette Buckley or call her as a witness at petitioner's trial. Ms. Buckley testified at her deposition in this *habeas* case that petitioner did not actually hand the drugs to officer Pappalito. She testified that she saw Mark Hill give Pappalito something and saw Pappalito give money to Hill. While she also testified that Walton's role was obtaining the amount of drugs Pappalito wanted, so that her testimony was incriminating to Walton, we nonetheless thought that her contradiction of Pappalito as to who actually delivered the drugs to him was significant enough to require an explanation as to why she was not called at trial.

At the evidentiary hearing, Ms. Buckley testified that she had been mistaken at her deposition. She had actually left the scene before the drug transaction took place, so that she could not testify as to who actually transferred the drugs. In view of this, there was obviously no prejudice to Walton from the failure of counsel to call Buckley as a witness, at least as far as the matter of the drug transfer was concerned. Walton also contends that Buckley would have been a helpful witness on the question of entrapment because she would have testified that Pappalito

pressured Walton to obtain drugs for him. Walton also contends that Mark Hill should have been called to describe the pressure Pappalito and he, Hill, put on Walton to deliver drugs. However, we agree with the above-quoted comments of the Illinois Appellate Court that the admitted drug dealings between Pappalito and Walton were too extensive to be consistent with an entrapment defense. It strikes us that this finding by the Illinois Appellate Court is probably entitled to the presumption of correctness provided for in 28 U.S.C. § 2254(d).[6]

We conclude, therefore, that Walton has failed to show prejudice from the failure of counsel to call Minnette Buckley or Mark Hill as witnesses to support his entrapment defense.

A final problem Mr. Walton has is that, even if the allegedly missing photographs and the testimony of Buckley and Hill would have supported his entrapment defense, it appears at least questionable whether interference with an entrapment defense would be a ground for *habeas* relief. See Eaglin v. Welborn, 57 F.3d 496, 500-02 (7th Cir. 1995).

---

[6] If this is a factual finding, it makes no difference that it was made by an appellate court rather than a trial court. The presumption applies to both trial and appellate court findings. See Sumner v. Mata, 449 U.S. 539, 546 (1981).

## **CONCLUSION**

For the foregoing reasons, the petition of Johnnie Walton for a writ of *habeas corpus* is denied.[2/]

Date:     June 20, 2001

ENTER:    _____
          John F. Grady, United States District Judge

---

[2/]    The court wishes to express its appreciation to court-appointed counsel, Charlene R. Foss, Esq. and Catalina J. Sugayan, Esq. of the firm of Lord, Bissell & Brook for their competent and extraordinarily diligent representation of the petitioner.